BLACK RIVER LBR. CO.

v.

SOUTHERN SCRAP MATERIAL CO.,

Appellant

---

(April 25, 1927. Opinion and Decree.)
(May 23, 1927. Rehearing Refused.)
(July 12, 1927. Writs of Certiorari and Review Denied by Supreme Court.)

---

(*Syllabus by the Court*)

1. **Louisiana Digest—Obligations—Par. 79, 86.**

The letters F. O. B. stand for "Free on Board," and mean that the seller shall bear all expenses of carriage until the goods are delivered at the place where they are to be F. O. B., and that all further expenses are upon the buyer.

Appeal from Civil District Court. Hon. Mark M. Boatner, Judge.

Action by Black River Lumber Company against Southern Scrap Material Company, Ltd.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

Dale, Young & Dale, of Vidalia; Spencer, Gidiere, Phelps & Dunbar, of New Orleans, attorneys for plaintiff, appellee.

Lazarus, Michel & Lazarus, H. S. Weil, of New Orleans, attorneys for defendant, appellant.

CLAIBORNE, J. The plaintiff claims the price of scrap iron sold to defendant.

The suit is based upon the following contract:

"Willets, La., March 8th, 1923
"Black River Lumber Company, Willets, La.,
"Gentlemen:
"Confirming conversation of even date, I agree to purchase from you: The chilled cast iron wheels with axles that were shown me, not less than 26 wheels in all, i. e., 26 axles and 52 wheels. The entire pile of scrap iron lying on the same siding east of the wheels. The entire pile of boiler tubes lying north of the saw mill. Price $10.00 per net ton, F. O. B. Cars, Willets, La. Terms net Cash, loading to be directed by myself. The accepted weight to be the certified weight given by the Texas and Pacific Railway. In the event that the weight cannot be ascertained prior to leaving Willets, terms are to be sight draft with bill of lading attached. I furthermore agree that I will accept those cars within ten days from date, if not this agreement cancels itself.
"Yours truly,
(Signed) "John S. Marshall,
"Baton Rouge, La."

Marshall transferred this contract to the defendant, the Southern Scrap Material Company on March 26th.

On March 27th the plaintiff wrote to defendant:

"Southern Scrap Material Co.,
"New Orleans, La.,
"Dear Sirs:
"Confirming our telephone conversation of yesterday in regard to loading the scrap iron.
"This material will be loaded as follows: 1 car Boiler Tubes, 1 car wheels with axles, 1 car miscellaneous scrap. These three cars will be consigned to the Southern Scrap Material Co. Immediately on receipt of B-L with certificate of weights attached, we will forward sight draft, B-L attached, to your office.
"Yours very truly,
"Black River Lumber Co."

On April 11th the plaintiff wrote to the defendant:

"Southern Scrap Material Co.,
"New Orleans,
"Gentlemen:
"We herewith enclose memorandum bills and Bills of Lading covering the following cars of scrap iron shipped to you:
T. & P. 9689 _____$191.50
S. L. and S. F. 71467 _____ 305.00
P. M. 10395 _____ 298.50
Penn 793334 _____ 214.50

"Original bills of lading and invoices with drafts have gone forward through our bank today, and you no doubt will be notified in due course.

"We have had some difficulty in securing Certificates of Weights from the Texas and Pacific Railway Co. We instructed them to mail us these certificates immediately upon weighing these cars, but somehow or other they failed to do so. We have just been successful today in obtaining these documents. We have written the Texas and Pacific Railway Co. that should any demurrage occur through their laxity in handling this matter that we expect them to absorb these charges.

"We trust that the delay in shipping has caused you no inconvenience.
"Yours truly,
"Black River Lumber Co."

On April 14th the defendant, the Southern Scrap Material Co., wrote to the plaintiff:

"The Black River Lumber Co., Willets, La.,
"Gentlemen:
"We are in receipt of yours of the 11th inst. enclosing memo. bill and duplicate bills of lading on four cars of scrap iron shipped to us at New Orleans, and note that you have sent original bills of lading to the bank in the form of drafts which is entirely satisfactory, inasmuch as you have advised the T. and P. Railroad to look to you for any demurrage of these cars if any.

"We beg to draw your attention, however to little items that you overlooked, namely, car Penn 793334 only weighs 42,900 lbs., the minimum charge for freight is 50,000 lbs., which is an underweight of 7,100 lbs., which on the basis of $4.20 per ton would make a balance due us on this car of $14.91.

"The same thing applies to car C. and P. 9669 weighing 38,300 lbs., which is 11,700 lbs. under the mimimum, which on the basis of $4.20 per ton makes balance due us on this car of $27.57.

"Would you please mail us your check for these two items by return mail, and oblige?

"Yours truly,
"Southern Scrap Material Co., Ltd.,
(Signed) "B. Turkheimer."

On April 13th the Southern Scrap Material Co. wired plaintiff:

"Four cars in New Orleans with heavy demurrage accruing. Railroad will not release cars account order notify. Have your agent wire Texas and Pacific, New Orleans to release cars to us at once, all demurrage chargeable your account."

On April 14th the defendant wrote to the plaintiff:

"With further reference to the purchase of Mr. Marshall from you on March 8th and subsequent correspondence between Mr. Marshall, yourselves and ourselves.

"Please be advised that unless we hear from you today as per phone conversation this morning that we will not accept the cars at the purchase price until we have had an opportunity to make an inspection of same.

"As advised you over the phone, the market has declined about $3.00 a ton within the last week or ten days and due to either your negligence or somebody's negligence for not having the bills of lading in our hands a week ago we cannot take the responsibility for the decline in the market in the meantime.

"We assure you that we dislike to be forced upon taking this stand, and if we do not hear from you today authorizing us to take the cars at the original purchase price made by Marshall, we will turn down this transaction altogether and will take the cars at the market price when same is turned over to us. If on the other hand we receive authority to take the cars today, we will take them at the original sale price by Marshall, otherwise we withdraw all quotations made

you and cancel any purchase which we may have with you.

"Yours truly,
"Southern Scrap Material Co., Ltd.,
(Signed) "A. Diefenthal."

In another letter dated April 16th the defendant made the following offer:

"Now, Mr. Andrews, inasmuch as these cars are now in New Orleans on very heavy demurrage, and we have inspected same this morning, we make you the following proposition: That we will pay you $11.00 per net ton F. O. B. cars New Orleans for the four cars at New Orleans at this time, and that we will either pay your draft at this price, less freight and demurrage accrued to date, or will take cars from the railroad you authorizing, them to turn over to us, and we will mail you our check immediately after freight and demurrage has been deducted, also difference on less than minimum."

Answering this letter and others on the 18th, the plaintiff declined the offer and said:

"In the writer's conversation with your Mr. Furkheimer this morning, he declined this proposition and advised Mr. Furkheimer that he would adhere strictly to the terms of the contract, which was entered into by ourselves and Mr. Marshall and which is binding. This contract does not specify any time for delivery, but does specify that these cars were sold $10.00 per net ton F. O. B. Willets, and you no doubt are aware of the fact that the consignor's responsibility ceases after receiving a clean B-L from the railroad. We advised you that we had some difficulty in securing certificates of weights from the railroad, which were absolutely essential before we could draw our drafts on you. Immediately upon receipt of these documents we forwarded our drafts drawn on you and advised Mr. Furkheimer that these papers were at the Canal Commercial Bank which was part of the contract. We therefore must insist that our drafts be paid, as drawn, billing us with the differential in minimum weight and demurrage, which has accrued up to Monday, April 16th. Immediately upon receipt of the necessary documents we would

send you a check covering these items and file claims for the demurrage with the T. and P. because we feel that they are entirely at fault in this matter.
          (Signed) "Black River Lumber Co."

The defendants declined.

It was finally agreed on May 1st between the plaintiff and the defendant, simply to relieve the parties from unnecessary further expenses and to minimize damages, leaving to each their rights in the premises, that the defendant should receive the bills of lading and pay $10 cash per ton F. O. B. New Orleans less demurrage and freight, without prejudice to the rights of either party.

On these conditions the scrap iron realized as follows:                        $1009.50

Less freight _____$452.43
Demurrage _____ 357.00    809.43
                                   _____
                                    $200.07

The plaintiff then filed suit for $809.43.

The plaintiff received the weight certificates from the Texas and Pacific Railroad on April 11, 1923, and immediately drew four drafts upon the defendant and mailed them for collection to a bank in Vidalia, with Bills of Lading attached, the Bills of Lading were to shipper's order, notify Southern Scrap Material Co. Said bank returned the Bills of Lading to plaintiff for endorsement; after endorsement they were returned to the Vidalia Bank which transmitted them on April 14th to the Canal Bank in New Orleans with the four drafts for collection; the defendants were notified on April 17th.

The defense is:

1st. That the scrap iron was to have been shipped within ten days and was not so shipped.

2nd. That the iron was shipped by plaintiff to its own order and the bills of lading were retained by plaintiff under its control until April 18th and—

3rd. That because of respondents' inability to obtain possession of the bills of lading and to claim the cars and unload them, heavy demurrage accrued which was due entirely to the fault of plaintiff.

There was judgment for plaintiff and defendant had appealed.

There was no time specified in the original Marshall contract of March 8th for performance by plaintiff. The obligation was on Marshall alone. The contract reads: "I furthermore agree that I will accept these cars within ten days from date, if not this agreement cancels itself, (signed) John S. Marshall." But this Marshall contract was transferred on March 26th to the defendant. By letter of March 27th the contract was amended and nothing thereon was stated as to time of performance. On March 26th the ten days had long since expired. The subsequent negotiations show that the time of performance was not an element. On the trial this defense was abandoned.

II.

The contract specified the price and the mode of payment, thus: "Price $10.00 per net ton F. O. B. cars, Willets, La. Terms net cash, loading to be directed by myself. The accepted weight to be the certified weight given by the Texas and Pacific Railroad. In the event that the weight cannot be ascertained prior to leaving Willets, terms are to be sight draft with bills of lading attached."

The contract fixed the terms of sale as "net cash." That meant payable cash on delivery. The delivery in this case was the transfer of the bills of lading. "The seller is not bound to make a delivery of the thing if the buyer does not pay the

price and the seller has not granted him any terms for the payment." C. C. 2487 (2463).

The plaintiff drew four drafts upon the defendant, and transmitted them, with bills of lading attached, to the Canal Bank for collection.

Plaintiff so informed the defendant by letter of April 11th and the defendant answered on the 14th that it was entirely satisfactory. The defendants subsequently refused to pay the drafts for the sole reason that demurrage had accrued for which they did not think they were liable.

### III.

We do not find it necessary to decide the much mooted question whether the delivery of goods at the place of shipment F. O. B. transfers the title to the purchaser. As the defendant denied liability for this demurrage the sole question before us is whether it was due by the defendant or by the plaintiff.

In Williston on Sales, Sec. 280, he said:

"If the buyer is to pay the freight it is a reasonable presumption that he does so because the goods became his at the point of shipment and the carrier is his agent transporting them. On the other hand if the seller is to pay the freight the inference is equally strong that the duty of the seller is to have the goods transported to their ultimate destination and that the carrier is his agent in transporting the goods. In mercantile contracts the letters 'F. O. B.' are frequently used to express the obligation of the parties in regard to the payment of freight and other charges. These letters which stand for the words 'free on board,' mean that the seller shall bear all expenses until the goods are delivered at the place where they are to be 'F. O. B.' By necessary implications, all further expense is upon the buyer. If, therefore, the contract provides that the goods are

to be delivered 'F. O. B.' at the point of shipment, the presumption that the property is to pass to them is applicable." 35 Cyc. 108.

This opinion is corroborated by the testimony of Mr. Defenthal, one of the defendants.

The defendants nowhere denied their liability for the freight. On the contrary they paid it. They denied their liability only for the demurrage, because as they alleged the fault for the delay was with plaintiff or with the railroad, its agent.

There is nothing that shows fault or negligence on the part of plaintiff in the delivery of the iron to the railroad, nor does defendant charge it.

Defendants charge plaintiff with culpable delay in drawing drafts upon them and delivering the bills of lading to them only several days after the railroad had carried the iron to New Orleans and was ready to deliver it, and after demurrage had accrued. But the contract specified that:

"The accepted weight to be the certified weight given by the Texas and Pacific Railway."

The action of the railway became therefore a condition precedent to fixing the value of the iron and the amount of the drafts to be drawn upon the defendants. The railway was the agent selected by the defendants to fix the amount they would have to pay for the iron according to its weight. The defendant would not pay upon the weights stated by plaintiff but only upon that determined by the railway. The railway did not make returns of weight until April 11th. Up to that date no negligence or fault is found with the plaintiff. If there was fault anywhere it was with the railroad. As the railway had been constituted by the

defendant as its special agent for that particular business of weighing, the defendant and not the plaintiff is liable for its delay up to April 11th and up to April 14th, the time it took to mail the drafts and bills of lading to New Orleans. The delay from April 14th to the 17th resulting from the failure of plaintiff to endorse the bills of lading amounts to $51 is properly chargeable to the plaintiff, which has been provided for by the District Judge. The defendant never offered to pay any part of the demurrage. They were liable for it, over and above the price of the iron, as the District Judge has found, and we agree with him.

## IV.

The defendant also argued that the plaintiff had breached his contract because the letter of March 27th by plaintiff to defendant stated that the cars will be consigned to the Southern Scrap Material Co., and that "sight drafts B-L attached will be forwarded 'to your office,'" while the plaintiff consigned the cars to its own order and the sight drafts were remitted to the Canal Bank for collection. This defense was not made in the answer.

The argument that if the iron had been consigned to the defendant he could have taken possession of it without payment is without force because the same letter of March 27th provides that "sight drafts, B-L attached, will be forwarded." This meant that the iron could not have been withdrawn without payment of the drafts.

But when the defendant was informed that the weights had been obtained and drafts drawn the defendant wrote on April 14th:

"We are in receipt of yours of the 11th inst. enclosing memo. bill and duplicate bills of lading on four cars of scrap iron shipped to us at New Orleans, and note that you have sent original bills of lading to the bank in the form of drafts which is entirely satisfactory inasmuch as you have advised the T. and P. Railroad to look to you for any demurrage of these cars if any."

These bills of lading state, "Consigned to Black River Lumber Co., notify Southern Scrap Material Co."

In the case of Lundy vs. Pfeifer, 162 La. 355, 110 South. 556, it did not appear that the plaintiff shipped the goods within the time specified in the contract, and that he instructed the carrier to notify A. L. Lundy, vendor, instead of Pfeifer and Co., buyers, according to contract. The evidence in this case shows that that defendant received from plaintiff duplicate bills of lading and from the bank notice of drafts, and that he declared "it was entirely satisfactory." If the iron had been consigned to the defendants they could not have received delivery of it without payment.

Notice of the sight drafts was sent to "defendants' office" through the Canal Bank for collection. The drafts themselves could not have been sent. The defendants understood that the drafts were to be remitted to their office through some bank as they telephoned to every bank in the city for them.

Judgment affirmed.